PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1784
_____

ROBERT T. MILLER,

Appellant

v.

AMERICAN AIRLINES, INC.;
AMERICAN AIRLINES, INC., Pilot Retirement
Benefit Program Fixed Income Plan (A Plan);
AMERICAN AIRLINES, INC.,
Pension Benefits Administration Committee
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 2-08-cv-00277)
District Judge:  Honorable A. Richard Caputo
_____

Argued November 16, 2010
Before:  AMBRO, FISHER and WEIS, *Circuit Judges*.

(Filed: 1/25/2011  )

Katie R. Eyer [Argued]
Michael J. Salmanson
Salmanson Goldshaw
1500 John F. Kenndey Boulevard
Two Penn Center, Suite 1230
Philadelphia, PA  19102
        *Counsel for Appellant*

Donald L. Havermann [Argued]
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Suite 800 North
Washington, DC  20004

Jonathan S. Krause
Michael J. Puma
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA  19103
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Robert T. Miller filed suit against American Airlines, Inc., the American Airlines, Inc. Pilot Retirement Benefit

2

Program Fixed Income Plan, and the American Airlines, Inc. Pension Benefits Administration Committee (collectively, "American"), alleging a violation of § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B). Miller asserted that American impermissibly terminated his long-term disability benefits, and informed him of this action in a vague and misleading letter. He further alleged that American's review of his case failed to consider all of his relevant diagnoses, as well as the unique requirements of his employment as a pilot. The District Court granted American's Motion for Summary Judgment, ruling that American's termination decision was proper. This appeal requires us to consider whether the administrative process that American employed complied with the procedural mandates of ERISA and, if not, whether the proper remedy is a remand to the plan administrator or a reinstatement of benefits. For the reasons stated herein, we will reverse the decision of the District Court. We hold that the termination of Miller's benefits was arbitrary and capricious in light of the numerous substantive deficiencies and procedural irregularities that pervaded American's decision-making process. We further hold that Miller is entitled to retroactive reinstatement of his disability benefits.

## I.

### A. Factual History

Miller was employed as a commercial airline pilot for American Airlines for nearly ten years. In August 1998,

3

Miller suffered a psychotic episode while on duty and was subsequently admitted to the hospital. He was prescribed various medications as part of his treatment regimen. Miller's FAA medical certification, required for all commercial pilots, was revoked.

Miller applied for long-term disability ("LTD") benefits under the American Airlines, Inc. Pilot Retirement Benefit Program Fixed Income Plan (the "Plan"), a defined benefit plan subject to ERISA, 29 U.S.C. § 1001 *et seq.* Miller began receiving treatment from a psychiatrist, Dr. Abel Gonzalez, in September 1998. Dr. Gonzalez diagnosed Miller as suffering from anxiety disorder and brief reactive psychosis. On February 3, 1999, Dr. Gonzalez reported to American that Miller had suffered brief reactive psychosis caused by physical fatigue, sleep deprivation, and emotional stress, and that his progress was "favorable." Thereafter, American awarded Miller LTD benefits in November 1999.

The Plan provides "own occupation" disability benefits, where a pilot deemed disabled from employment as a pilot for American may receive benefits even if he could work in a different capacity. Under the Plan, "[d]isability means an illness or injury verified through a qualified medical authority . . . which prevents a Member from continuing to act as an Active Pilot Employee in the Service of the Employer." (App. at 717.) In addition, an employee will no longer be eligible for LTD benefits if, among other things, "verification of such Disability can no longer be established." (*Id.* at 739.) The Plan vests discretionary authority with a

4

Pension Benefits Administration Committee ("PBAC") that has the power to determine benefits eligibility. Charlotte Teklitz was the delegate of the PBAC who reviewed appeals from the denial or termination of benefits.

In May 2003, American informed Miller that it could no longer substantiate his disability and terminated his benefits as a result. Dr. Gonzalez subsequently submitted documentation reiterating that Miller had been diagnosed with anxiety and brief reactive psychosis. Dr. Gonzalez noted that Miller had taken medication until January 2000 and that he had been "asymptomatic" since the spring of 2001. (*Id.* at 112.) He further noted that Miller would be able to return to work once his FAA medicate certification was reinstated. In June 2003, Dr. Gonzalez provided four progress notes at American's request. His notes stated that Miller remained asymptomatic, that he was not taking any medication, and that pursuant to FAA regulations he was still not able to work. After receiving this information, American determined that Miller "[m]edically qualifies for [the] disability pension program" and reinstated his LTD benefits. (*Id.* at 148.)

Over the next two years, American periodically requested medical updates from Miller to document his disability. In response, Dr. Gonzalez provided documentation that Miller was still under his care, that he was seen monthly, and that he was not taking any medication. American subsequently noted that Miller was not expected to return to work. In August 2005, Miller provided another letter from Dr. Gonzalez reporting that Miller was asymptomatic, that he

required adequate sleep to prevent manifestations of stress, and that he was not taking any medication. On October 16, 2006, Dr. Gonzalez provided four additional progress notes stating that Miller's diagnosis was the same, that he was doing well, that he was "in general asymptomatic with good mental stability," and that he was not taking any medication. (*Id.* at 107.)

On October 23, 2006, American sent Miller a letter notifying him that his LTD benefits were terminated. The letter provided:

> We are in receipt of your recent correspondence from Dr. Abel Gonzalez, submitted in response to our letter of September 21, 2006 from Jeanne Spoon, RN. However, we are unable to verify either the existence of a continuing medical disability or your continued substantial progress towards obtaining your FAA medical certification.

(*Id.* at 98.) The letter then quoted the Plan and stated that a pilot's disability will cease if "verification of such Disability can no longer be established." (*Id.*) The letter further elaborated:

> In order to receive further favorable consideration, you will need to demonstrate that you are actively pursuing obtaining your FAA medical certification.

6

> At this time, however, verification of your continued disability cannot be established and your disability benefits under the Plan will end immediately[.]

(*Id.*) Significantly, the Plan does not make eligibility for LTD benefits contingent on a pilot's pursuing medical certification with the FAA. Upon receiving this letter, Miller contacted American and inquired as to why his benefits were terminated. In response, American referred him to the termination letter and did not provide any additional information. Miller appealed the decision to the PBAC on November 30, 2006. To support his claim, Miller included a completed appeal form stating that he continued to have active psychiatric diagnoses and submitted a letter from Dr. Gonzalez.

In this letter, Dr. Gonzalez stated that Miller "has been continually and [] permanently disabled from obtaining a Class One Medical Certificate as required by F.A.A. regulations since August of 1998." (*Id.* at 340.) Dr. Gonzalez further clarified that Miller "remains permanently disabled due to medical reasons." (*Id.*) According to Dr. Gonzalez, Miller continued to suffer from anxiety and psychosis, as he had since his original diagnosis. Dr. Gonzalez then went on to summarize Miller's treatment:

> The necessity for this continuated [sic] treatment has and will continue to exist because of the nature of his psychiatric conditions.

More specifically, his diagnosis reveals and refers to latent vulnerability on his mental status so that prevention [sic] medical treatment, when adequate, may be sufficient. However, no medical treatment has the capacity to neither revert, undo, nor cure such condition.

(*Id.*) Dr. Gonzalez concluded by noting that Miller continued on active treatment necessary to preserve his health and that his prognosis was fair.

In light of the disagreement as to Miller's eligibility for LTD benefits, American referred the case to Western Medical Evaluators ("WME") for an outside medical review on March 27, 2007.[1] American directed WME to perform an "evidence-based, forensic medical review/evaluation" of Miller's case. (*Id.* at 300.) The letter from American stated that Miller's "[c]onditions [c]laimed" were anxiety disorder and brief reactive psychosis. (*Id.*) Additionally, American prompted WME to answer six specific questions regarding the evidentiary support for the "continuing presence of [Miller's] psychiatric diagnoses." (*Id.* at 301.)

---

[1] The Plan dictates that disputes will be referred to a clinical authority and that those findings "regarding the nature and extent of such illness or injury shall be final and binding upon the Administrator, the Association and the Member and his Beneficiaries." (App. at 785-86.)

In response, Drs. Seskind and Crain of WME reviewed Miller's file and provided American with a report on April 20, 2007. Neither performed a physical evaluation of Miller or communicated with him. Dr. Crain's report reviewed the documents in Miller's file and found that the records "did not document any psychiatric problems or explain [Miller's] failure to obtain the required medical certificate." (*Id.* at 310.) As such, Dr. Crain determined that Miller was not disabled. Dr. Seskind's portion of the report noted that FAA standards require that a pilot not suffer from psychosis. He then went on to say it was "crucial to note" that Miller was not undergoing psychotherapy, that he was not taking medication, and that he had not attempted to obtain his FAA medical certification. (*Id.* at 312.) In light of the fact that Miller had not requested a formal approval of his psychiatric designation from an FAA medical examiner and been denied this certification, Dr. Seskind found that Miller "is therefore not really disabled." (*Id.*) On May 22, 2007, American sent Miller a letter which included the WME report and reaffirmed the termination decision.

## B. Procedural History

On February 13, 2008, Miller filed a complaint against American in the United States District Court for the Middle District of Pennsylvania alleging a claim for benefits pursuant to ERISA § 502(a)(1)(B). Both parties filed cross-motions for summary judgment. On November 30, 2009, the Magistrate Judge issued a report and recommendation proposing that that District Court grant Miller's motion for

summary judgment and order the retroactive reinstatement of his benefits. *Miller v. American Airlines, Inc.*, No. 08-CV-277, 2009 WL 6039583, at *1 (M.D. Pa. Nov. 30, 2009). According to the report, American's termination of Miller's LTD benefits was arbitrary and capricious due to numerous procedural errors on the part of American. *See id.*

On March 8, 2010, the District Court rejected the Magistrate's report and granted summary judgment in favor of American. *Miller v. American Airlines, Inc.*, No. 08-CV-277, 2010 WL 890016, at *11 (M.D. Pa. March 8, 2010). The District Court determined that American's termination decision was not arbitrary and capricious. *See id.* In its ruling, the District Court concluded that American had received new information from Dr. Gonzalez that Miller was "asymptomatic," and therefore properly concluded that he was no longer disabled. *See id.* at *8. Additionally, the District Court concluded that the termination letter sufficiently described the reasons for discontinuing Miller's LTD benefits. *See id.* at *9. Likewise, the District Court determined that American did not impermissibly rely on Miller's failure to obtain his FAA medical certification. *See id.* Finally, the District Court found that American adequately addressed Miller's diagnoses and job requirements as set forth in the WME report. *See id.* at *10.

Miller filed a timely notice of appeal.

**II.**

The District Court had jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over an order granting summary judgment. *See Shook v. Avaya, Inc.*, 625 F.3d 69, 72 (3d Cir. 2010). "In exercising this review, '[w]e may affirm the order when the moving party is entitled to judgment as a matter of law, with the facts reviewed in the light most favorable to the non-moving party.'" *Id.* (quoting *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009)); Fed. R. Civ. P. 56(c). We review a challenge by a participant to a termination of benefits under ERISA § 502(a)(1)(B) under an arbitrary and capricious standard where, as here, the plan grants the administrator discretionary authority to determine eligibility for benefits. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-16 (2008); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). An administrator's decision is arbitrary and capricious "if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (quotations and citations omitted).[2]

---

[2] In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical. *See Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010).

We review various procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was funded, to determine if the conclusion was arbitrary and capricious. [3] *See*, *e.g.*, *Glenn*, 554 U.S. at 116-17; *Estate of*

---

[3] In *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court determined that when an ERISA plan grants discretion to the administrator, whether the administrator operates under a conflict of interest is a factor that must be weighed in determining if there was an abuse of that discretion. 489 U.S. 101, 115 (1989). After *Firestone*, our Court employed a "sliding scale" standard of review where the level of conflict would influence the intensity of arbitrary and capricious review. *See Post v. Hartford Ins. Co.*, 501 F.3d 154, 161 (3d Cir. 2007). The Supreme Court's subsequent decision in *Metropolitan Life Insurance Co. v. Glenn*, however, instructed that "*Firestone* means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." 554 U.S. 105, 117 (2008).

As a result of *Glenn*, the "sliding scale" approach is no longer valid. *See Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). Instead, we "apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Id.* Accordingly, even though our cases prior to *Glenn* are no longer good law to the

12

*Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525-26 (3d Cir. 2009).  Whereas "[t]he structural inquiry focuses on the financial incentives created by the way the plan is organized," i.e., whether there is a conflict of interest, "the procedural inquiry focuses on how the administrator treated the particular claimant." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007).  Specifically, in considering the process that the administrator used in denying benefits, we have considered numerous "irregularities" to determine "whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality."  *See id.* at 165 (internal citations omitted).  Ultimately, we "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117.

## III.

### A.  Termination of Benefits

Section 502(a)(1)(B) of ERISA allows a participant to bring a claim to recover benefits due to him under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).[4]  Miller asserts that

---

extent they applied the "sliding scale" approach, the various factors that our Court has historically evaluated must still be considered on arbitrary and capricious review.  *See id.* at 526.

[4] ERISA § 502(a)(1)(B) provides:

"A civil action may be brought –

American's termination of his LTD benefits was arbitrary and capricious because (1) the decision was not based on substantial evidence, (2) American operated under a structural conflict of interest whereby it had the incentive to deny his claim, and (3) American committed numerous procedural errors during its review of his case. We address each argument in turn.

## 1. Support for the Termination Decision

We determined in *Schwing* that where there was "an abundance of evidence of [the claimant's] misconduct to support the denial of [the] claim," a structural conflict of interest or procedural irregularities would not serve to "tip[] the scales in favor of finding that the [administrator] abused its discretion." 562 F.3d at 526. American contends, at the outset, that there was "overwhelming evidence of the absence of a disability" that "plainly" supports the termination of Miller's benefits, and that we should not consider whether any procedural irregularities tainted their decision-making. (American Br. at 19, 34.) In this regard, American relies heavily on Dr. Gonzalez's description of Miller as being "asymptomatic" to argue that there was substantial support

---

(1) by a participant or beneficiary –

…

(B) to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

14

for their decision to terminate benefits and that any irregularities should be disregarded. American essentially argues that because Dr. Gonzalez labeled Miller as asymptomatic, he had actually been erroneously awarded benefits in the past and this had gone unnoticed. We disagree.

The record demonstrates, contrary to American's assertion that Miller simply slipped through the cracks, that American exercised frequent oversight in Miller's case. In fact, American reviewed and relied on documentation from Dr. Gonzalez stating that Miller was asymptomatic and, on multiple occasions over several years, found that this description supported the payment of benefits. Notably, in 2003, American determined that Miller "[m]edically qualifies for [the] disability pension program" and reinstated his LTD benefits after receiving records describing him as asymptomatic. (App. at 148.) Yet, after receiving additional reports containing this *same* description, American terminated Miller's benefits. As such, American interpreted Dr. Gonzalez's characterization of Miller as asymptomatic to mean that he was both eligible for disability benefits and that his benefits should be terminated. American's reliance on the term "asymptomatic" as the linchpin of Miller's ineligibility for disability benefits is, therefore, misplaced.

Further, the record reveals that although Dr. Gonzalez reported that Miller was no longer taking medication, he consistently stated that Miller was still under his care. Indeed, American noted twice after receiving records from

15

Dr. Gonzalez that Miller was unable to return to work as a pilot. (*Id.* at 105-06.) In addition, American's internal records repeatedly state that Miller was diagnosed with anxiety and brief reactive psychosis. (*Id.* at 104-06.) Notably, only a few days before American terminated Miller's benefits, American's records state that Miller's diagnosis was the "same." (*Id.* at 107.) Finally, Dr. Gonzalez's letter in support of Miller's appeal to the PBAC notes that his psychiatric conditions are permanent and that continued treatment is necessary to stabilize his health.

A review of the administrative record, therefore, demonstrates that although Miller may not have been outwardly manifesting symptoms, his psychiatric diagnoses remained constant and required regular treatment. As such, Dr. Gonzalez's report that Miller suffered from anxiety diagnosis and brief reactive psychosis constituted "an illness or injury verified through a qualified medical authority," thus satisfying the definition of disability under the Plan. (*Id.* at 717.) Unlike *Schwing*, the administrative record does not contain "an abundance of evidence" of ineligibility such that we should ignore any procedural defects in the termination decision. 562 F.3d at 526. Because we disagree with American's assertion that Dr. Gonzalez's description of Miller as being "asymptomatic" forecloses our inquiry into whether the termination of benefits was arbitrary and capricious, we consider each factor in turn.

16

**2.     Structural Conflict of Interest**

In a situation where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (internal citation omitted).   In *Glenn*, the Supreme Court held that a conflict emerges "where it is the employer that both funds the plan and evaluates the claims" because "[i]n such a circumstance, 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.'"   554 U.S. at 112.  (internal citation omitted).

Prior to *Glenn*, we consistently held that there is no conflict of interest when an employer operates an actuarially grounded plan whereby claims are paid through a trust.  *See*, *e.g.*, *Post*, 501 F.3d at 164 n.6; *Skretvedt v. E.I. DuPont de Nemours and Co.*, 268 F.3d 167, 174 (3d Cir. 2001); *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 388 (3d Cir. 2000); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 n.4 (3d Cir. 1997); *Abnathya*, 2 F.3d at 45 n.5.  In that type of arrangement, the employer makes fixed contributions based on an actuarial formula that estimates the plan's projected benefit obligation.  *See Pinto*, 214 F.3d at 388.  Therefore, we previously determined that no conflict existed because the employer did not incur a direct expense in allowing benefits, nor did it gain a direct benefit in denying claims.  *See id.*

17

In light of *Glenn*, however, we conclude that this approach is no longer valid. *Glenn* instructs that a conflict arises where an employer both funds and evaluates claims. *See* 554 U.S. at 112. The Supreme Court's broad view of whether a conflict of interest exists, therefore, encompasses an arrangement where an employer makes fixed contributions to a plan, evaluates claims, and pays claims through a trust. Even in an actuarially grounded plan, the employer provides the monetary contribution and any money saved reduces the employer's projected benefit obligation. *See id.* The Supreme Court did recognize, however, that a conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." *Id.* at 117.

Turning to the case at hand, the Plan is a defined benefit plan that American funds based on an actuarial formula. The record reveals that although American did meet ERISA's minimum funding requirements in 2006, the year Miller's benefits were terminated, the Plan still lacked funds to meet a significant amount of its projected benefit obligation. Despite the fact that American made fixed contributions to the Plan, every dollar that American saved by reducing disability payments decreased its projected benefit obligation. American argues that WME's involvement in the review process insulated American from any conflict of interest because the WME report was binding on all parties. We do not believe that the WME review totally eliminated

18

any conflict of interest.  First, it is undisputed that American terminated Miller's benefits well before WME became involved at the appeal stage.  Second, Charlotte Teklitz, the PBAC representative, testified in her deposition that American could seek further review of the WME report's conclusions if it was dissatisfied with its analysis.  (App. at 549.)  Though the WME review of Miller's claims may have ameliorated some of the effects of the conflict of interest, the fact remains that American did have some incentive to terminate Miller's benefits.  And, even though this conflict is rather indirect, we must afford it some weight in light of *Glenn*.  *See* 554 U.S. at 112.  Therefore, American's structural conflict of interest weighs slightly in Miller's favor.

**3.    Procedural Factors**

**a.    Reversal of Position**

An administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion.  *See*, *e.g.*, *Post*, 501 F.3d at 164-65; *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000).  Miller claims that American abruptly terminated his benefits in 2006 upon evaluating the same information that it had previously found to support an award of benefits.  The District Court found that our decision in *Foley v. International Brotherhood of Electrical Workers Local Union 98 Pension Fund*, 271 F.3d 551 (3d Cir. 2001), dictates that

19

American should not be prevented from terminating Miller's benefits, despite the fact that it previously awarded them. *See Miller*, 2010 WL 890016, at *8. In any event, the District Court further concluded, American did not unjustifiably reverse its position as to Miller's eligibility because American received reports from Dr. Gonzalez that Miller was asymptomatic in 2005 and 2006 to support the conclusion that he was no longer disabled. *See id.*

Our review of the decision in *Foley* leads us to conclude that it is not controlling in this situation. In *Foley*, the claimant argued that it was arbitrary and capricious for the employer to refuse to apply an exception for calculating credited service when it had previously interpreted the pension plan to allow the exception for other employees. *See* 271 F.3d at 554. We rejected that argument, reasoning that it would be improper to effectively foreclose an employer from correcting a previous erroneous interpretation of a plan. *See id.* at 558-59. Thus, *Foley* deals with an employer's reversal of a previous interpretation of a plan's *language*. It does not address the significance of an employer's inconsistent treatment of medical evidence used to determine whether a claimant is disabled. In fact, we made clear in *Post*, decided after *Foley*, that an employer's reversal of position as to whether a claimant is disabled is a significant factor to be weighed on arbitrary and capricious review. *See Post*, 501 F.3d at 164-65.

Turning to the District Court's alternative conclusion that American did not reverse its position, we disagree that

20

the documentation from Dr. Gonzalez provided new information regarding Miller's eligibility for benefits. The records that American received from Dr. Gonzalez in 2005 and 2006 stating that Miller was asymptomatic do not differ in any material aspect from the records submitted in 2003 that American determined supported a disability finding. For example, Dr. Gonzalez reported in 2003 that Miller was diagnosed with anxiety and brief reactive psychosis, but that he was currently asymptomatic. Later, in 2005, Dr. Gonzalez stated that Miller was asymptomatic and was working toward preventing manifestations of stress. Similarly, in 2006, Dr. Gonzalez reported that Miller's diagnoses remained the same and that he was asymptomatic. Each report mirrors the next and identifies Miller as "asymptomatic." Thus, the more recent records were only "new" to the extent that they had not been received before; they did not provide any new information.

Moreover, American admitted that it could not determine whether there was any change that occurred in Miller's psychiatric condition between January 2003 and May 2007. As a result, the information that American relied upon to terminate Miller's benefits in 2006 was the same type of documentation that American interpreted to support a disability finding in 1999 and again in 2003 through 2006. We recognize that American's initial payment of Miller's benefits does not operate as an estoppel such that they can never terminate benefits. But, in the absence of any meaningful evidence to support a change in position, American's abrupt reversal is cause for concern that weighs

21

in favor of finding that its termination decision was arbitrary and capricious. *See id.*; *see also McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) (reversal of position supported arbitrary and capricious finding where information used to terminate benefits did "not vary significantly from the [previous] opinions").

### b. Reliance on Non-Existent Plan Requirements

We have previously held that an employer who imposes requirements extrinsic to the plan in evaluating eligibility for benefits acts arbitrarily and capriciously. *See*, *e.g.*, *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 443 (3d Cir. 1997); *Epright v. Envtl. Res. Mgmt., Inc. Health and Welfare Plan*, 81 F.3d 335, 342-43 (3d Cir. 1996). Miller argues that American acted arbitrarily and capriciously by relying in part on his failure to obtain his FAA medical certification. The District Court found that the reference to the FAA certification was "troubling" and "regrettable" when the Plan did not impose this requirement. *Miller*, 2010 WL 890016, at \*9. Nonetheless, the District Court concluded that the termination decision could have been based on American's inability to verify Miller's disability or Miller's failure to obtain the recertification. *See id.* Because the letter concluded by noting that "verification of [Miller's] continued disability cannot be established," the District Court reasoned that the FAA medical certification language was "harmless error." *Id.* The District Court did not consider whether American relied on Miller's failure to obtain his FAA certification during the appeal stage.

22

Based on the plain language in the termination letter, as well as the other evidence in the record, we conclude that American did rely, to some extent, on Miller's failure to obtain his FAA medical certification. First, the letter states that American was "unable to verify either the existence of a continuing medical disability or [Miller's] continued substantial progress towards obtaining [his] medical certification." (App. at 98.) Therefore, there were apparently two potential bases for American's decision, one of which was Miller's failure to seek his FAA medical recertification. In addition, the letter instructs that Miller could receive "further favorable consideration" if he demonstrated that he was actively pursuing the certification. (*Id.*) It is unlikely that American would include this instruction if Miller's obtaining his FAA certification did not somehow bear on his eligibility for benefits.

Second, American offered no evidence to establish, contrary to the termination letter's focus, that it did not rely on this requirement. Dr. Bettes, the author of the termination letter, testified that he could not recall whether the decision to terminate Miller's benefits was influenced by Miller's failure to seek medical certification. (*Id.* at 1130.) In fact, Dr. Bettes also testified that a pilot's failure to apply for FAA certification could contribute to his decision to deny benefits. (*Id.*)

Moreover, Drs. Crain and Seskind placed significant weight on Miller's failure to obtain his medical certification in the WME report. Notably, Dr. Crain remarked that "[t]he

23

records of Dr. Gonzalez do not document any psychiatric problems or issues to explain his failure to obtain the medical certificate, so that it cannot be attributed to a mental disorder." (*Id.* at 310.) Likewise, Dr. Seskind devoted a significant portion of his report to a discussion of Miller's failure to regain his FAA medical certification. His analysis concluded by noting that because Miller had not been denied this certification, he was not suffering from a mental illness and therefore was not truly disabled. Because American adopted the WME report and included it in the final letter affirming the termination of Miller's benefits, it relied on this requirement. Given that American did not offer any evidence to contradict the plain language of the letter, the overreaching emphasis on this requirement in the termination letter and throughout the appeal process demonstrates that it was a factor in the termination decision here. The Plan does not compel a pilot to seek FAA medical certification in order to be eligible for LTD benefits. Thus, American's imposition of this requirement is a factor that counsels towards finding that the termination decision was arbitrary and capricious. *See Mitchell*, 113 F.3d at 443; *Epright*, 81 F.3d at 342-43.

### c. Compliance with Section 503 of ERISA and Accompanying Regulations

Section 503 of ERISA requires that every employee benefit plan must:

> "(1) provide adequate notice in writing to any participant or beneficiary whose claims for

24

benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

29 U.S.C. § 1133. The accompanying regulations note that "this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. § 2560.503-1(a). The regulations require a plan administrator to provide written notification of any adverse benefit determination setting forth

[I]n a manner calculated to be understood by the claimant . . . (i) [t]he specific reason or reasons for the adverse determination; (ii) [r]eference to the specific plan provisions on which the determination is based; (iii) [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]"

25

*Id.* § 2560.503-1(g)(1).  The District Court determined that § 503 and the accompanying regulations were irrelevant to Miller's claim, as it was brought pursuant to § 502.  *See Miller*, 2010 WL 890016, at *9.  The District Court erred in this regard.  Although § 502 provides the private right of action to bring a claim to recover benefits due, § 503 sets forth the basic requirements governing ERISA plans.  To that end, a plan that does not satisfy the minimum procedural requirements of § 503 and its regulations operates in violation of ERISA.  Therefore, an administrator's compliance with § 503 in making an adverse benefit determination is probative of whether the decision to deny benefits was arbitrary and capricious.  *See*, *e.g.*, *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009); *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 87 (2d Cir. 2009); *Grossmuller v. Int'l Union*, 715 F.2d 853, 856-57 (3d Cir. 1983); *Kao v. Aetna Life Ins. Co.*, 647 F. Supp. 2d 397, 410 (D.N.J. 2009).  Indeed, the Department of Labor has noted that "the procedural minimums of the regulation are essential to procedural fairness."  Department of Labor Pension and Welfare Benefits Administration, 65 Fed. Reg. 70246, 70255 (proposed Nov. 21, 2000) (codified at 29 C.F.R. § 2560).

We briefly addressed whether a denial letter set forth adequate "specific reasons" under § 503 and the accompanying regulations in *Grossmuller*, 715 F.2d at 858. There, we determined that the administrator's termination letter did not comply with § 503 where it informed the claimant that his benefits were terminated because he was found to be otherwise gainfully employed, without providing

26

any factual basis to support the decision or stating upon what evidence the administrator relied. *See id.* Conversely, in *Syed v. Hercules Inc.*, 214 F.3d 155 (3d Cir. 2000), we concluded that the letter satisfied § 503 where it explained that the claimant's benefits were terminated because the results of the particular doctor's independent medical evaluation demonstrated that he was no longer disabled. *See* 214 F.3d at 162-63. The administrator reached this conclusion after analyzing the present physical diagnosis in light of the definition of total disability under the plan. *See id.*

Other decisions addressing this discrete issue are also instructive. For example, the Seventh Circuit held in *Halpin v. W.W. Grainger, Inc.*, that the termination letter did not satisfy § 503 when it stated that "no objective medical evidence was contained in [the] claim to substantiate total disability from any gainful occupation." 962 F.2d 685, 692-93 (7th Cir. 1992). The court instructed that the bare conclusions in the letter, unsupported by any rationale, did not set forth "specific reasons" as mandated by § 503. *See id.* at 693. Similarly, in *Vanderklok v. Provident Life and Accident Insurance*, 956 F.2d 610 (6th Cir. 1992), the Sixth Circuit found that the denial letter did not comply with § 503. There, the letter informed the claimant accordingly, "[w]e regret that the claim does not qualify . . . because the proof does not establish that the insured is totally and permanently disabled." 956 F.2d at 616. The court determined that the letter's purported "reasons" were simply unsupported

conclusions that did not provide any specific information as to the basis for the denial. *See id.*

By contrast, in *Hobson v. Metropolitan Life Insurance Co.*, 574 F.3d 75 (2d Cir. 2009), the Second Circuit reasoned that the denial letter complied with § 503 because it described the precise information that was lacking from the file, such as whether claimant's depression was severe enough to result in suicidal thoughts or hospitalization, whether the seizures were ongoing, and whether the claimant exhibited the diagnostic criteria for the relevant disease. Accordingly, the Second Circuit found that the administrator's letter presented the claimant with a specific rationale for the denial of benefits, not simply a conclusory statement that she was ineligible. *See id.* at 87.

We find the termination letter in this case to be legally deficient under § 503 for two reasons. First, the letter does not provide "specific reasons for [the] denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133. The letter states that American is "unable to verify either the existence of a continuing medical disability or [Miller's] continued substantial progress towards obtaining [his] FAA medical certification." (App. at 98.) American's inability to "verify" Miller's disability is a bare conclusion that does not provide a specific reason for the termination decision. Rather, this purported explanation is a general blanket assessment that Miller is ineligible for disability benefits. The letter makes no mention of Miller's specific diagnoses nor the precise information that is lacking from his

28

file. Moreover, the letter provides no insight into why the records that American received, and based on which American previously awarded and reinstated benefits, would no longer support a disability finding. American was on notice that this letter was not "written in a manner calculated to be understood by the participant" because Miller subsequently inquired as to the specific reasons for the termination, but was simply referred back to the letter itself. The letter's mention of FAA certification is the most specific reason given for the termination, but this reference is misleading because it was not a prerequisite under the Plan and therefore not a valid reason to deny Miller's LTD benefits. The language in the letter is more akin to the conclusory statements in *Grossmuller*, *Halpin*, and *Vanderklok*, where the plan administrator summarily concluded that the claimant was ineligible, or that the evidence received did not support the claim without providing further factual support. *See Halpin*, 962 F.2d at 692-93; *Vanderklock*, 956 F.2d at 616; *Grossmuller*, 715 F.3d at 858. And, unlike the letter in *Hobson* that set forth the precise information lacking from the file or the decision in *Syed* that analyzed the physical diagnosis in light of the definition of total disability, the letter here did neither. *See Hobson*, 574 F.3d at 87; *Syed*, 214 F.3d at 162-63. Thus, we believe that the language of the termination letter is conclusory and does not provide the "specific reasons" as to why Miller was no longer eligible for benefits, falling short of the requirements under § 503.

29

Second, we conclude that the termination letter does not provide the precise information necessary to advise Miller how to perfect his claim. The regulations accompanying § 503 require the termination letter to describe "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(iii). Here, the letter informed Miller that "[i]n order to receive further favorable consideration, you will need to demonstrate that you are actively pursuing obtaining your FAA medical certification." (App. at 98.) Obtaining this certification, however, is not a requirement under the Plan and would therefore not serve to change his disability status. Given that the letter did not set forth any additional instruction as to how Miller could achieve a favorable disability determination, it does not comply with 29 C.F.R. § 2560.503-1(g)(1)(iii). The termination letter here does not satisfy the basic procedural mandates of ERISA, as set forth in § 503 and the relevant regulations. Instead of ensuring the procedural fairness of the termination decision, this letter made it exceedingly difficult for Miller to understand, let alone challenge, the bases for American's course of action. For that reason, American's noncompliance with the statute weighs in favor of finding that their decision was arbitrary and capricious.

### d.      Analysis of All Relevant Diagnoses

An administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is also a cause

for concern that suggests the decision may have been arbitrary and capricious. *See Kosiba v. Merck & Co.*, 384 F.3d 58, 68-69 (3d Cir. 2004). In *Kosiba*, we instructed the district court to consider on remand whether the administrator properly evaluated the claimant's medical conditions. *See id.* In doing so, we emphasized that an administrator's failure to take into account multiple documented diagnoses suggests that a denial of benefits was not the product of reasoned decision-making. *See id.* Similarly, in *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501 (6th Cir. 2005), the Sixth Circuit held that the administrator's reliance on an outside physician's report that made only a passing reference to the claimant's diagnosis of depression, without further analysis, called into question the reasonableness of the decision. The court noted it was significant that the claimant had two distinct diagnoses, depression and a heart condition, but the administrator failed to adequately consider whether the depression alone would impact the claimant's ability to return to work. *See id.* at 510.

American argues, and the District Court agreed, that it adequately considered Miller's anxiety diagnosis because Dr. Crain concluded, "Miller does not have overt evidence of a treatable medical condition." (App. at 310.) Miller counters that American did not properly examine his anxiety diagnosis because neither the termination letter nor the WME report sufficiently analyzed this condition. We note at the outset that the termination letter does not mention either of Miller's diagnoses – anxiety disorder or brief reactive psychosis. Therefore, we look to whether the WME report addressed

Miller's claimed diagnoses. Our review of the WME report itself leads us to the conclusion that, contrary to American's broad interpretation of the evaluators' analysis, it did not adequately scrutinize Miller's anxiety diagnosis. In ordering the report, American specifically directed WME to evaluate Miller's claims that he suffered from these two conditions. Additionally, the 2006 letter from Dr. Gonzalez, mentioned in the WME report, states that Miller suffered from anxiety.

Despite the prompting by American, neither Dr. Crain nor Dr. Seskind devoted any of their discussion to Miller's anxiety diagnosis. Dr. Seskind made no reference to anxiety in his portion of the report, but rather began his analysis by noting that it was essential that Miller not suffer from psychosis. He went on to discuss the symptoms of psychosis, the fact that Miller was not taking any medication, and that he had not obtained his FAA medical certification. Dr. Seskind concluded by noting that "[s]ince this is now getting into the distant past of at least six years," Miller was no longer disabled because he was not undergoing formal psychiatric treatment. (*Id.* at 312.) In this regard, Dr. Seskind's report focuses exclusively on Miller's psychotic episode; there is no discussion whatsoever of Miller's claim that he continued to suffer from anxiety or Dr. Gonzalez's 2006 letter stating the same.

Dr. Crain's portion of the report is likewise deficient in its analysis of Miller's anxiety diagnosis. Although Dr. Crain does mention Miller's anxiety, he makes this reference in the context of describing the various medical records from Dr.

32

Gonzalez. Interestingly, Dr. Crain acknowledged Dr. Gonzalez's report that "[n]o medical treatment could revert, undue or cure [Miller's] underlying condition." (*Id.* at 310.) Yet, Dr. Crain ultimately observed that the "psychiatric records show no objective evidence of continuing disability," without providing insight into why the anxiety diagnosis was no longer supported. (*Id.*) He further noted that "[a]lthough I do not have all of the facts concerning the emotional stresses that led to the onset of Mr. Miller's psychosis, I assume that now, after nine years, these issues have been dealt with through psychotherapy." (*Id.* at 311.) This conclusion seemingly focuses on Miller's initial diagnosis of psychosis. The remainder of Dr. Crain's report discusses the risk that Miller may have another psychotic episode.

Notwithstanding the fact that Drs. Crain and Seskind had received records chronicling Miller's anxiety and were directed by American to evaluate this diagnosis, the WME report did not present any analysis of this condition or explain why it no longer rendered Miller disabled. Whereas the report does address Miller's psychosis, it fails to devote any meaningful discussion to Miller's claim that he suffered from continuing anxiety. A mere reference that Miller has been diagnosed with anxiety, without providing any explanation of why that diagnosis is no longer supported, casts doubt on the reasonableness of American's decision-making. *See Kalish*, 419 F.3d at 510. American did not request further clarification from WME and accepted the report as provided in ultimately terminating Miller's LTD benefits. Although we recognize that American is not required to credit Dr.

Gonzalez's reports over Drs. Crain and Seskind simply because he was Miller's treating physician, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), we are skeptical of American's exclusive reliance on the conclusions in the WME report to determine that Miller was not disabled when the report neglects to substantively analyze Miller's anxiety diagnosis. Therefore, given that American did not mention the anxiety diagnosis in its termination letter and the WME report was incomplete in its analysis, American cannot be said to have fully considered all of Miller's diagnoses. This omission counsels towards finding that American's decision was arbitrary and capricious. *See Kosiba*, 384 F.3d at 68-69.

### e. Job Requirements

Although we have not previously so held, various courts have determined that an administrator's proper consideration of the claimant's ability to perform his or her job requirements in light of the relevant diagnosis is a significant factor to evaluate on arbitrary and capricious review. *See*, *e.g.*, *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir. 2006) (determining that plan administrator's decision could not be considered "reasoned" when there was no discussion of claimant's duties or her ability to complete them in light of diagnoses); *Kalish*, 419 F.3d at 507 (finding that administrator's conclusion that claimant "might be capable of sedentary work cannot be a rational basis for finding that he was not disabled, given that his former occupation required him to walk, stand, and reach

34

for several hours a day"); *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 296-97 (W.D. Pa. 2008). In *Elliott*, the Sixth Circuit expressed skepticism of the insurance company's conclusion that the claimant was not disabled when it did not consider the specific requirements of her position. *See* 473 F.3d at 619. The court observed that the administrator's denial letter simply recited the diagnoses of the claimant's condition, but did not provide any explanation of how the claimant could be expected to perform the functions of her job in light of these ailments. *See id.* Therefore, the court determined, the administrator "cannot be said to have given a *reasoned* denial of [the] claim." *Id.* (emphasis in original).

We find this analysis persuasive because it is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually perform the specific job requirements of a position. The District Court did not consider whether American adequately addressed Miller's ability to fulfill his job requirements. Miller contends that neither the termination letter nor the WME report provided any explanation of how he could perform the essential duties of his position as a pilot. American did not address Miller's ability to function as a pilot in the termination letter; however, the WME report canvasses the extent to which it considered the actual job requirements Miller had to fulfill. American included a job description and a list of essential functions that a pilot must perform when it ordered the WME report. Therefore, we

35

consider whether the WME report adequately addressed Miller's ability to function as a pilot.

Even though the WME evaluators determined that Miller was not disabled, they arrived at this conclusion without considering whether he could actually perform his duties as a pilot in light of his diagnoses. According to American's job description, a pilot must, among other things, "be able to work varying hours of the day or night," possess "[c]apability of decision-making under stress," as well as "[t]he ability to adapt to diversified flight schedules, situations, or scenarios." (App. at 303-05.) In addition, because the Plan provides "own occupation" disability benefits, it is essential to consider whether a pilot is capable of working in that capacity, regardless of his ability to function in a different position. Although Dr. Crain concluded that Miller was "not disabled from his occupation as a Pilot," he also recognized that Miller was at risk of having another psychotic episode if he was exposed to physical fatigue, sleep deprivation, and emotional stress. (*Id.* at 311.) As such, there is a striking incongruity between Dr. Crain's conclusion that Miller could return to work as a pilot – having to operate under considerable stress – and his recognition that stress, fatigue, and sleep deprivation could prompt another psychotic episode. Moreover, Dr. Crain did not address how the fact that Dr. Gonzalez had diagnosed Miller with anxiety would be compatible with his ability to work under stress as a pilot.

On the whole, we believe that Dr. Crain's conclusion that Miller could perform as a pilot, without explaining how his claimed anxiety and latent risk of psychosis would be compatible with this uniquely stressful position, is perfunctory. Accordingly, American's failure to address the specific demands that Miller would face as a pilot suggests that the termination decision was not reasoned and based on an individualized assessment of Miller's ability. Thus, this is a significant oversight that suggests the decision was arbitrary and capricious. *See Elliott*, 473 F.3d at 619; *Kalish*, 419 F.3d at 507.

### 4.      Weighing of the Factors

To decide whether an administrator's termination of benefits is arbitrary and capricious, we "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117. Here, we give significant weight to our conclusions that American reversed its initial position that Miller was disabled and terminated his benefits without receiving supporting information that differed in any material way from the information upon which it previously relied, and that American considered Miller's failure to obtain his FAA medical certification when it was not required under the Plan.[5] We find equally troubling American's noncompliance

---

[5] Though the imposition of an extra-Plan requirement is far from the only irregularity presented in this case, we note that this fact alone likely would have supported a holding that

with ERISA's notice requirements under § 503, as well as American's failure to fully evaluate Miller's anxiety diagnosis and to reconcile the demanding job requirements of a commercial pilot with Miller's continuing anxiety and risk that he would experience a recurring psychotic episode. Finally, we afford slight weight to the fact that American operated under a conflict of interest in light of its incentive to deny benefits claims. Viewing these factors as a whole, we believe that American's decision to terminate Miller's LTD benefits was not the product of reasoned decision-making and substantial evidence. *See Abnathya*, 2 F.3d at 45. Rather, there were numerous procedural irregularities and substantive errors on American's part, giving us "reason to doubt its fiduciary neutrality." *Post*, 501 F.3d at 165. Thus, we conclude that American's termination of Miller's benefits was arbitrary and capricious. *See Glenn*, 554 U.S. at 117.

## B. Remedy

Having determined that American abused its discretion, we consider the appropriate remedy. We have not squarely addressed the issue of the appropriate remedy for an improper termination of benefits under § 502(a)(1)(B). American argues that if we find the termination decision to be arbitrary and capricious, we must remand the case to the Plan administrator pursuant to our decision in *Syed*, 214 F.3d at 162. There, we determined that a remedy for a violation of

American's decision to terminate Miller's LTD benefits was arbitrary and capricious.

38

ERISA § 503 is a remand to the plan administrator so as to provide the claimant with the benefit of a full and fair review of the claim. *See id.* We are not persuaded. Miller's claim is based on § 502 for an improper termination of his LTD benefits. As previously discussed, whether the notice requirements of § 503 are met is relevant to this action only insofar as American's noncompliance with the statute factors into arbitrary and capricious review. *Syed* is readily distinguishable and not controlling on this issue.

Other courts addressing this question have determined that retroactive reinstatement of a claimant's benefits is the proper remedy when the administrator's termination decision was unreasonable. *See*, *e.g.*, *Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1221 (9th Cir. 2008); *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629 (7th Cir. 2005); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003); *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 599 (6th Cir. 2001); *Halpin*, 962 F.2d at 697; *Harrison v. Prudential Ins. Co. of Am.*, 543 F. Supp. 2d 411, 424 (E.D. Pa. 2008). In deciding whether to remand to the plan administrator or reinstate benefits, we note that it is important to consider the status quo prior to the unlawful denial or termination. *See Hackett*, 315 F.3d at 776. As such, an important distinction emerges between an initial denial of benefits and a termination of benefits after they were already awarded. In a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled. To

39

restore the status quo, the claimant would be entitled to have the plan administrator reevaluate the case using reasonable discretion. In the termination context, however, a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully. Accordingly, benefits should be reinstated to restore the status quo.

In this case, American abused its discretion in terminating Miller's LTD benefits. Therefore, retroactive reinstatement of his benefits is necessary.

## IV.

We conclude that American acted arbitrarily and capriciously in terminating Miller's LTD benefits. The decision-making process that American applied was flawed in many aspects, demonstrating that the assessment of Miller's disability was not the product of a reasoned, disinterested fiduciary. Given that multiple factors counsel in Miller's favor and that his benefits were unlawfully terminated, we find that retroactive reinstatement of his benefits is the appropriate remedy. Therefore, we reverse and remand to the District Court for entry of summary judgment in favor of Miller. Additionally, we direct the District Court to order American to retroactively reinstate Miller's LTD benefits, effective from the date of termination.

WEIS, Circuit Judge.

It is doubtful that the Administrator acted in an arbitrary and capricious manner in accepting the clinical findings of American's medical evaluators rather than those of Miller's physician. As we have held, "[u]nder the arbitrary and capricious standard, the court must defer to the administrator of an employee benefit plan unless the administrator's decision is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 41 (3d Cir. 1993) (reversing grant of summary judgment in favor of plaintiff and directing entry of judgment in favor of defendant).

Further, the court must be vigilant not to "substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits" and may overturn a plan administrator's decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. at 45 (quotations omitted).

The Administrator's adoption of the opinions of American's medical evaluation team, rather than that of Miller's physician, is a choice that is not unusual in cases like

41

this and is one usually entrusted to the Administrator.[6] See Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 258 (3d Cir. 2004) (courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation" (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003))); see also Boiling v. Eli Lilly & Co., 990 F.2d 1028, 1029-30 (8th Cir. 1993) ("The

---

[6] This deferential standard in the face of a clear, if not uncommon, conflict of interest is not without criticism. Indeed, we have observed that it may "simply invite[ ] drafters of employee benefit plans to insert boilerplate language in plan documents to ensure that courts will apply a deferential standard of review over the decisions of the plan administrator." Abnathya, 2 F.3d at 45 n.5 (discussing John H. Langbein, The Supreme Court Flunks Trusts, 1990 Sup. Ct. Rev. 207, 220-23); see also Paul J. Schneider & Brian M. Pinheira, ERISA: A Comprehensive Guide 8-15 (3d ed. 2008) ("Most employee benefit plans contain (or can easily be amended to provide) appropriate boiler-plate language giving plan administrators discretion to interpret the plan"). Although we have questioned this degree of deference, neither Congress nor the Supreme Court has addressed the issue further, see Abnathya, 2 F.3d at 45 n.5 (expressing desire for additional guidance from the Court or an amendment to the ERISA statute), and it is, therefore, a standard that we are obliged to uphold.

42

Committee did not abuse its discretion merely because there was evidence before it that would have supported an opposite decision").

In addition, neither the asserted procedural missteps cited by Miller nor the alleged conflict of interest actually prejudiced his administrative appeal. These factors were at most *de minimus* and did not hinder full consideration of the relevant issues. A much more objective test for evaluating whether the termination of benefits was arbitrary and capricious lies in the Administrator's failure to address Miller's claim that, because of his illness, he could not return to work as a pilot for American.

The Plan at issue in this case provides long term benefits to any "pilot who is prevented from acting as a cockpit crewmember in the service of [American Airlines] due to a [d]isability." Disability, in turn, is defined as "an illness . . . verified through a qualified medical authority that prevents a pilot from continuing to work as a pilot for [American Airlines]."

An individual who does not have a medical certificate issued by the FAA may not be employed as a pilot for American Airlines. Miller did not have a certificate in the year 2006, when his benefits were terminated. Moreover,

federal regulations state that, in order to be eligible for such a certificate, one must, among other things, have "[n]o established medical history or clinical diagnosis of . . . [a] psychosis." 14 C.F.R. § 67.107(a)(2).[7] The Plan does not require Miller to apply for a medical certificate after the onset of his disability, nor did it authorize American to apply for certification on his behalf. However, the requirement of FAA medical certification is inherent in the Plan's definition of disability. By failing to address this issue, the Plan Administrator deprived Miller of a full and fair hearing and thus committed an abuse of discretion. See, e.g., Grossmuller v. Int'l Union, United Auto., Aerospace & Agric. Implement

---

[7]   "As used in this section, 'psychosis' refers to a mental disorder in which:

(i)  The individual has manifested delusions, hallucinations, grossly bizarre

or disorganized behavior, or other commonly accepted symptoms of this

condition; or (ii)  The individual may reasonably be expected to manifest

[those symptoms]." 14 C.F.R. § 67.107(a)(2). A waiver of these requirements may be granted only if the applicant shows to the satisfaction of the Federal Air Surgeon that the duties applied for "can be performed without endangering public safety." 14 C.F.R. § 67.401(a).

44

Workers of Am., 715 F.2d 853, 857 (3d Cir. 1983) ("To afford a plan participant whose claim has been denied a reasonable opportunity for full and fair review, the plan's fiduciary must consider any and all pertinent information reasonably available to him").

Miller's lack of FAA medical certification has been an issue from the outset of this case. In its October 23, 2006, letter advising him that his disability benefits would be terminated, American stated, "we are unable to verify either the existence of a continuing medical disability or your continued substantial progress towards obtaining your FAA medical certification." In addition, Miller was advised that, "[i]n order to receive further favorable consideration, you will need to demonstrate that you are actively pursuing obtaining your FAA medical certification."

In his application for the administrative appeal of the termination decision, Miller cited his inability to obtain a medical certificate from the FAA. He explained that he was "unable to return to active flight status due to a medical history of psychosis and a general anxiety disorder." When asked for the basis of his appeal, he wrote, "still sick, under continuing psychiatric care, and unable to obtain an airman medical certificate due to psychosis and a general anxiety disorder."

45

The medical opinions of Dr. Gonzalez as well as those of Drs. Crain and Seskind underscore the interdependence between the Plan's definition of "disability" and the requirement of FAA medical certification. As Dr. Gonzales reported in a letter dated November 22, 2006, "Mr. Miller has been continually and [will] be permanently disabled from obtaining a Class One Medical Certificate as required by F.A.A. regulations since August of 1998." Further, he had "not regained his Class One Medical Certificate as the exclusive and direct consequence of the permanent status of his mental illness."[8]

As a member of the Plan's medical evaluation team, Dr. Seskind, himself a Senior Aviation Medical Examiner, noted,

---

[8] This was not the first time that Dr. Gonzalez referred to the requirement of FAA medical certification. In a June 10, 2003, letter to American Airlines, he wrote that "Mr. Miller has been asymptomatic and able to safely return to his usual work since the spring of 2001. I anticipate Mr. Miller will return to his regular work upon reinstatement of his FAA medical certificate . . . . Once released by the chief FAA psychiatrist, Mr. Robert Miller's working hours should strictly abide by the FAA regulations on maximum hours to be worked without periods of rest in between (FAA [Part 12] requirements)."

"From an AME [f]ederal [a]viation [s]tandpoint, I quote [14 C.F.R.] Section 67.107, for first class airman medical certificate[. T]he medical standards are that there be no psychosis, which means that the individual has manifested delusions, hallucinations, grossly bizarre or disorganized behavior or other commonly accepted symptoms of his condition or the individual may reasonably be expected to manifest [such symptoms]."

He concluded, "[m]y medical opinion is that while a senior AME would not be able to issue a medical certificate in such a case on his own, . . . the FAA might well favorably regard this gentleman as capable of flying under proper supervision. . . . [T]here is no real evidence that he is disabled and incapable of performing his flight duties."

Thus, although the Plan's medical experts (and, arguably, Miller's own physician) opined that he was physically capable of returning to work as a pilot, the fact

47

remains that Miller is now and will remain unable to resume those duties unless the FAA reissues his medical certificate.

The Administrator's lack of attention to this issue may have been explained in the deposition of Charlotte Teklitz, American's Managing Director of Benefits and Productivity, who was delegated by American's Pension Benefits Appeals Committee to resolve appeals from disability benefit terminations. She testified that "[t]he plan has no requirement . . . for the pilot to continue to try to get [his] FAA [certification]" and later explained, "[y]ou have to be disabled from the occupation of pilot, and the FAA certification is not specifically relevant." Therefore, she denied the plaintiff's appeal because of "the third party medical review[,] which indicates from both of these doctors that he is no longer disabled from the occupation of pilot."

Potentially inconsistent with that testimony, however, are American's Pilot Disability Case Management Notes for Miller. These indicate that, in 2003 (after American had terminated the plaintiff's disability benefits the first time), the fact that FAA regulations precluded plaintiff from returning to work within five years of stopping certain medications may have been a factor in determining that his disability benefits should be reinstated.

48

One note, for example, mentioned that Miller "[c]an not RTW [return to work] for 5 yrs after stopping meds. . . . [M]eds discontinued Jan. 02- PCD of Jan 07"). Those same notes indicate that, in November 2005, American hoped to "obtain authoriz[ation] to submit [his medical information] to [the] FAA" on a "hunch . . . that he might be a candidate" for medical clearance notwithstanding his history of psychosis "after a 10 yr stable observation period."

To reiterate, under American's Plan, a pilot may receive long-term disability benefits if he is prevented from acting as a crew member in service to the company because of an illness or injury. Miller meets that definition. He is prevented from returning to employment as a pilot because his medical history (and the basis for his nearly decade-long receipt of disability benefits) precludes him from obtaining the necessary licensure. In other words, he has an illness that seemingly would prevent the FAA from certifying him; as a result, he contends he is unable to function as a pilot for American and therefore is entitled to benefits.

Whether Miller was "prevented" from returning as a "cockpit crew member" due to a "disability" or history of a disability that prevents his service was a contention raised by him but not decided by the Pension Benefit Appeals Committee. The Committee's failure to address that claim

49

deprived Miller of a full and fair review, <u>see</u> 29 U.S.C. § 1133(2), and, therefore, amounted to an abuse of discretion.

To clarify, I need not (and do not) decide that Miller's lack of FAA certification *per se* entitles him to benefits. It is enough that the Administrator declined to rule on a serious and substantial issue.

Remand is not necessary because there is no dispute over the relevant facts and the legal issues were apparent to the parties. Accordingly, I join in reversing the judgment of the District Court.